**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Hoyt CUPPS, Jr., Defendant-Appellant.**

**No. 74–1127.**

United States Court of Appeals, Sixth Circuit.

Argued June 6, 1974.

Decided Sept. 24, 1974.

Combs & Combs, Pikeville, Ky., for defendant-appellant; Dan Jack Combs, Jack Emory Farley, Pikeville, Ky., on brief.

Eugene E. Siler, Jr., U. S. Atty., John M. Compton, Asst. U. S. Atty., Lexington, Ky., Kenneth P. Glover, Bureau of Alcohol, Tobacco & Firearms, Cincinnati, Ohio, on brief, for plaintiff-appellee.

Before PECK, McCREE and ENGEL, Circuit Judges.

McCREE, Circuit Judge.

This appeal requires us to decide whether a police officer, who has stopped a motorist on the highway to make a statutory inspection of his operator's license, may order the motorist to leave his vehicle after a valid license has been produced, in the absence of probable cause to believe that the motorist has committed an offense. We determine that he may not, agreeably with the Fourth Amendment, and therefore do not find it necessary to reach the other issues argued on appeal.

In a jury trial which concluded on September 6, 1973, Cupps was convicted of possessing a pistol in violation of 18

U.S.C. App. § 1202(a)(1).[1] The events which led to his conviction occurred on April 29, 1971.[2] On that day, Kentucky state police officers Hubert Jarvis and Jerry Combs were driving up the access road to a state police barracks when they observed Cupps' white Cadillac automobile as it preceded them up the drive. Cupps' vehicle turned around and immediately went back down the road toward the City of Hazard, and the officers recognized Cupps, who they knew had been convicted 12 years earlier for the possession of untaxed alcoholic beverages, a felony. Combs testified that he "immediately turned and gave chase." He signaled Cupps to pull to the side of the road and, followed by Jarvis, left the police car and approached Cupps' automobile. Combs then asked to see Cupps' driver's license. Cupps showed him a valid license, and Combs handed the license to Jarvis and ordered Cupps out of the car. Combs then proceeded to walk around to the other side to scrutinize Cupps' two passengers more closely. At this point, Combs testified that he spotted a Colt pistol on the front seat of the car, in a place that would have been under Cupps' leg had Cupps still been sitting in the car.[3] He called Jarvis' attention to it, ordered the other two men out of the car and searched them "[n]ot

physically, but more or less sort of went over them with a search."[4] Cupps was asked why he had gone to the barracks, and he explained that he had been "roughed" by a fellow in a state police vehicle the preceding night and that his attorney had advised him to go to the barracks to ascertain the license number of the police vehicle. Jarvis replied "that [Cupps] had a poor lawyer, that his lawyer would get him killed," and seized the gun. A Hazard city police officer who had stopped to offer assistance checked police records and reported that the pistol had not been stolen. Cupps claimed ownership of the gun, and Jarvis gave him a receipt for it and informed him that it would be turned over to federal agents.[5]

Combs testified that his purpose in detaining Cupps was "to check and see first if Mr. Cupps still had his operator's license, and I wanted to know the individuals that was in the vehicle also." Jarvis testified that he "wanted to see what Hoyt Cupps' business was up there." He testified that Cupps might have gone up to the barracks for the purpose of dynamiting it. He believed Cupps should have stopped at the barracks and stated his business there, and that state police "have a perfect right to

---

1. 18 U.S.C.App. § 1202(a) provides, in pertinent part:

 (a) Any person who—

 (1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony,

 . . .

 . . . .

 and who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

2. The indictment was issued on March 20, 1972, and on March 9, 1973, the defendant's motion to suppress the weapon as evidence was overruled. A trial leading to a hung jury ended on March 27, 1973, necessitating this trial, which ended on September 6, 1973.

 Cupps was sentenced to 2 years imprisonment, probated to 3 years and was fined $5,000.

3. Cupps was not called as a witness at the hearing on the motion to suppress, but he testified at trial that the gun had been under an armrest in the center of the seat, and not under his leg. Since we hold that the police were not rightfully in a position to see the gun even if it were in plain view, as Combs and Jarvis testified, we think this discrepancy is immaterial.

4. Cupps testified at trial that Combs asked him for his license, ordered him out of the automobile, stood him up against the car, hit him, ordered him to stand straight, searched him, opened the car door, and reached under the armrest to get the gun. Both officers denied having searched Cupps, although they admitted having searched his companions.

5. Cupps was not arrested by the state officers, because it was Kentucky practice to refrain from making arrests on federal charges without a warrant.

stop any vehicle upon any public highway for examination," without a reason.

 Under Kentucky state law, state police are empowered to demand, without other justification, the production of a valid driver's license of any driver.[6] Upon challenge, the Kentucky Court of Appeals upheld the constitutionality of this statute when a roadblock was set up to stop all drivers indiscriminately, but reserved judgment about selective application of the procedure. Commonwealth v. Mitchell, 355 S.W.2d 686 (Ky.1962).[7]

 The Supreme Court has said that the law governing warrantless searches and seizures of automobiles "is something less than a seamless web."[8] Nevertheless, the Fourth Amendment provides certain basic protections to the motorist. "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.' Katz v. United States, 389 U.S. 347, 357 [88 S. Ct. 507, 514, 19 L.Ed.2d 576]; Coolidge v. New Hampshire, 403 U.S. 443, 454–455 [91 S.Ct. 2022, 2031–2032, 29 L.Ed. 2d 564]; Chambers v. Maroney, 399 U.S. 42, 51 [90 S.Ct. 1975, 1981, 26 L.Ed.2d 419]." Schneckloth v. Bustamonte, 412 U.S. 217, 218, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973).

 One of these exceptions concerns automobiles. Thus, under Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), an unconsented search of an automobile may be conducted without a warrant and without probable cause for arrest, where the police have probable cause to believe it is carrying contraband. However, "the Carroll doctrine does not declare a field day for the police in searching automobiles. Automobiles or no automobiles, there must be probable cause for the search." Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L. Ed.2d 596 (1973).[9] Cardwell v. Lewis, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), extended the Carroll mobile vehicle exception to the warrantless seizure of an immobile and unoccupied automobile and examination of its exterior in an impoundment area. Cardwell did not, however, eliminate the re-

───

6. Ky.Rev.Stat. § 186.510 (1971) provides, in pertinent part:

 The licensee shall have his license in his immediate possession at all times when driving a motor vehicle and shall display it upon demand to . . . a member of the Kentucky state police . . . .

 Kentucky police are not empowered to inspect vehicles for possible violation of the motor vehicle laws without reasonable cause:

 ' The commissioner, uniformed officers and troopers of the department of public safety and department of motor transportation and such other officers and employees of the department and any other peace officer . . . may, at any time, upon reasonable cause to believe that a motor vehicle is unsafe or not equipped as required by law, or that its equipment is not in proper adjustment or repair, require the driver of 'such motor vehicle to stop and submit such vehicle to an inspection . . . .

 Ky.Rev.Stat. § 189.730(1) (1971) (emphasis added).

7. We do not find it necessary to express an opinion about the validity of the selective stopping of motorists for license inspections. Selective license checks were upheld in United States v. Lepinski, 460 F.2d 234 (10th Cir. 1972); United States v. Turner, 442 F. 2d 1146 (8th Cir. 1971). But cf. Commonwealth v. Swanger, 453 Pa. 107, 307 A.2d 875 (1973); Commonwealth v. Hagan, 464 S.W.2d 261, 263 (Ky.1971).

8. Cady v. Dombrowski, 413 U.S. 433, 440, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (Rehnquist, J.). See generally Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L. Rev. 349 (1974); Note, Warrantless Searches and Seizures of Automobiles, 87 Harv.L. Rev. 835 (1974).

9. Cady, supra, is inapposite. That case affirmed the power of local police, charged with a "community caretaking" function, to search an immobilized and unoccupied automobile in police custody but stored in an open lot, where there is reason to believe it may contain a dangerous weapon—another exigent circumstance.

quirement of probable cause. *Id.* 589–590, 94 S.Ct. 2464.[10]

■ The case before us now, however, does not involve the search of an automobile. The evidence is uncontroverted that the gun became visible to the police only after Cupps was ordered out of the automobile. If the police were rightfully in the position from which they observed the weapon, the plain view exception would have been applicable and they could have seized the gun without a warrant. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). The question which is presented, then, is whether, in ordering Cupps out of the car, the police exceeded what we assume, *arguendo*, was their lawful authority to stop him for the purpose of examining his driver's license. In the absence of consent,[11] this action was a seizure under the Fourth Amendment. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ In Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), Justice Rehnquist stated the rule governing searches of persons in automobiles: "So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." 407 U.S. at 146, 92 S.Ct. at 1923 (explaining *Terry, supra*). The officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry, supra,* at 21, 88 S.Ct. at 1880. In *Adams*, the officer acted on the basis of an informant's tip that the defendant was in possession of narcotics and was armed. Because the intrusion was limited to action necessary for self protection,[12] the Court held that the protective search incident to a reasonable investigatory stop was permissible under *Terry*, even though defendant was suspected only of a possessory offense. In the case before us, when the police officers required Cupps to leave his car, they did not possess any articulable basis for suspecting criminal behavior on his part or possession of contraband, and they had no reason to fear for their own safety. There is nothing in the record to indicate that even the minimal standards of *Terry* were met. The officers' personal knowledge of Cupps' criminal record was not an irrelevant consideration; "[b]ut to hold [that] that knowledge . . . constituted probable cause would be to hold that anyone with a previous criminal record could be arrested at will." Beck v. Ohio, 379 U.S. 89, 97, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964). Knowledge of appellant's prior record was insufficient either to establish probable cause or to afford the basis for reasonable suspicion. Jarvis testified that he believed that Cupps intended to dynamite the police barracks when in midday he drove up to the facility in a white Cadillac, but this belief, expressed as a second thought, does not validate the search.

10. The holding, furthermore, was expressly confined to searches of automobile exteriors: [W]e are not confronted with any issue as to the propriety of a search of a car's interior. "Neither *Carroll* . . . nor other cases in this Court require or suggest that in every conceivable circumstance the search of an auto even with probable cause may be made without the extra protection for privacy that a warrant affords." Chambers v. Maroney, 399 U.S. at 50, 90 S.Ct. at 1980. Cardwell v. Lewis, 417 U.S. 583, 592, 94 S.Ct. 2464, 2470, 41 L.Ed.2d 325 (1974).

11. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The burden of proof is on the state to demonstrate voluntariness. *Id.* 248–249, 93 S.Ct. 2041.

12. The informant tipped the officer that the defendant was in possession of a weapon as well as narcotics, and indicated where on the defendant's person the officer could expect to find the weapon. The officer walked over to the defendant, who sat alone in a parked car, and asked him to open the car door. Instead, the defendant rolled down his window. The officer reached in and removed a weapon from the precise spot on the defendant's body that the informant had described.

Jarvis admitted that he did not look for any dynamite after Cupps was pulled to the side of the road, and the district court made no finding crediting this assertion as justification for the seizure.

 In determining that the seizure of Cupps went beyond any exception to the rule proscribing warrantless searches of vehicles, we have assumed, *arguendo*, that the state police have, as appellee contends, under their authority to inspect licenses, an absolute right to stop any driver. Although it is unnecessary to decide the question in this appeal, we observe that the officers' claim that this was their reason for stopping appellant is refuted by other evidence. They testified that they followed and stopped Cupps because they wanted to know his business and the identity of his passengers, and not because they wanted to inspect his license. At least one of them believed that citizens could be required to state their business in a public place before being allowed to proceed. Police may not lawfully use their general inspection powers as a pretext for stopping motorists for the purpose of inquiring about their business on the public highways.[13] The pretextuous nature of the stop in this case is demonstrated by the fact that Cupps' driving to the police barracks was an entirely lawful act. A person acts lawfully when he enters a public place without disturbing the peace to make a record of public property openly displayed. Jarvis and Combs acted beyond their authority when they ordered Cupps out of the automobile, and, therefore, the plain view doctrine never became operative. Unless an officer has a right to be where he is, "plain view *alone* is never enough to justify the warrantless seizure of evidence." Coolidge v. New Hampshire, 403 U.S. 443, 468, 91 S.Ct. 2022, 2039, 29 L.Ed.2d 564 (1971) (emphasis in original).

The judgment is reversed, and the case is remanded with instructions to dismiss the indictment, since the inadmissibility of the weapon as evidence precludes a conviction for its unlawful possession.

---

13. United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), decided after the trial of this case, is inapposite. That case established that police have authority to conduct a search incident to any lawful full custody arrest, without regard to the nature of the offense. In short, *Robinson* presumes the existence of probable cause for arrest.

The Court, in *Robinson*, did not directly address the problem of pretext arrests. However, a search incident to full custody arrest is permissible only if it is (1) lawful; and (2) conducted in accordance with regular departmental procedures. 414 U.S. at 221 n. 1, 94 S.Ct. 467 (1973). Presumably, should an arrest be made solely as a pretext to conduct a search, that search would not be in accordance with regular departmental procedure. Certainly, the lower courts have firmly refused to allow evidence gathered from such searches to be used against the defendant. See, e. g., Hill v. United States, 135 U.S.App.D.C. 233, 418 F.2d 449 (1968); Amador-Gonzalez v. United States, 391 F.2d 308 (5th Cir. 1968); Montana v. Tomich, 332 F.2d 987 (9th Cir. 1964); Taglavore v. United States, 291 F.2d 262 (9th Cir. 1961); cf. United States v. Santana, 485 F.2d 365, 367–368 (2d Cir. 1973); United States v. Green, 151 U.S.App.D.C. 35, 465 F.2d 620, 622 n. 5 (1972).